**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KATHLEEN FRANCESCHELLI,** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 3:09-1553** |
| **v.** | : | **(MANNION, M.J.)** |
| **VERIZON PENNSYLVANIA, INC.,** | : | |
| **Defendants** | : | |

**MEMORANDUM AND ORDER**[1]

Pending before the court is the defendant's motion for summary judgment. (Doc. No. 45). Based upon the court's review of the motion and related materials, the defendant's motion will be granted.

By way of relevant procedural background, on July 10, 2009, the plaintiff initiated the instant action in the Court of Common Pleas of Lackawanna County, Pennsylvania, in which she alleged claims pursuant to the Age Discrimination in Employment Act, ("ADEA"), 29 U.S.C. §§621, et seq., and the Pennsylvania Human Relations Act, ("PHRA"), 42 P.S. §§951, et seq. The matter was removed to this court on August 13, 2009. (Doc. No. 1).

On September 13, 2009, the plaintiff filed an amended complaint, in which she omitted the ADEA claim and substituted an Americans with Disabilities Act, ("ADA"), claim pursuant to 42 U.S.C. §§12101, et seq. (Doc. No. 13). The PHRA claim remained. An answer to the amended complaint

---

[1]For the convenience of the reader of this document in electronic format, hyperlinks to the court's record and to authority cited have been inserted. No endorsement of any provider of electronic resources is intended by the court's practice of using hyperlinks.

was filed on October 14, 2009. (Doc. No. 15).

In the meantime, on October 13, 2009, the parties signed a consent to proceed before the undersigned, and on October 15, 2009, the instant action was referred to the undersigned to conduct all proceedings and order the entry of a final judgment in accordance with 28 U.S.C. §636(c) and Fed.R.Civ.P. 73. (Doc. No. 17).

At the close of discovery, on December 15, 2010, the defendant filed the instant motion for summary judgment, (Doc. No. 45), along with a supporting brief, (Doc. No. 46), a statement of facts, (Doc. No. 47), and exhibits, (Doc. No. 48). The plaintiff filed a response to the defendant's statement of facts on January 20, 2011, (Doc. No. 52), along with an opposing brief, (Doc. No. 53). An amended opposing brief was filed on February 21, 2011. (Doc. No. 55). A reply brief, (Doc. No. 58), and supplemental appendix, (Doc. No. 59), were filed by the defendant on March 10, 2011.

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

The Supreme Court has stated that:

> ". . . [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the

> existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."

Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. Id. The moving party can discharge that burden by "showing . . . that there is an absence of evidence to support the nonmoving party's case." Id. at 325.

Issues of fact are genuine "only if a reasonably jury, considering the evidence presented, could find for the nonmoving party." Childers v. Joseph, 842 F.2d 689, 693-94 (3d Cir. 1988) (citations omitted). Material facts are those which will effect the outcome of the trial under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The court may not weigh the evidence nor make credibility determinations. Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998). In determining whether an issue of material fact exists, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the nonmoving party. Id. at 393.

If the moving party meets his initial burden, the opposing party must do

3

more than raise some metaphysical doubt as to material facts, but must show sufficient evidence to support a jury verdict in its favor. Id.

In her complaint, the plaintiff alleges that, from April 5, 1993, until September 20, 2003, she was employed by the defendant as a Residential Collections Consultant in their Wilkes-Barre, Pennsylvania, office. During this time, her job performance consistently met or exceeded the defendant's performance standards and she performed her job satisfactorily and never gave defendant cause to terminate her employment.

When the Wilkes-Barre office closed in October of 2003, the plaintiff was transferred to the Scranton, Pennsylvania, office in the position of a Residential Sales Consultant, where she remained until she was terminated on October 25, 2007.

Between March 2007 and July 2007, the plaintiff alleges that she was granted Family Medical Leave Act, ("FMLA")/Short Term Disability leave on three occasions while her physicians analyzed a lump located in her neck and provided treatment. The plaintiff alleges that the defendant was aware of the reasons for the absences.

While on leave, the plaintiff alleges that the location of her work station was moved away from her group and anyone who did the same job function as she did. On or about, August 31, 2007, the plaintiff's work station was moved back to its original location.

Upon the plaintiff's return from leave, she alleges that she requested to

be trained on any policies and procedures that had been updated or changed while she was off, but that she was not trained or given the opportunity to observe any other employees at their work station.

During the week of September 24, 2007, the plaintiff's supervisor observed her on several calls, for which she received coaching and verbal direction as to how to service the customer better.

On September 25, 2007, the plaintiff alleges that she was diagnosed with lupus, which has substantially limited her major life activities.

The plaintiff was terminated from her employment on October 25, 2007. At all times prior to this, the plaintiff alleges that she was capable and qualified to perform her job. In addition, in her 14 ½ years of employment with the defendant, the plaintiff alleges that she never received any warnings, disciplines, or suspensions.

Prior to the plaintiff's termination, she alleges that no other Verizon employees were terminated on their first offense for the same or similar infraction of which she was accused. After her termination, the plaintiff alleges that it is her belief that her position was given to persons without medical conditions that substantially limited their major life activities. The plaintiff alleges that her health condition was the determining factor in the defendant's decision to terminate her employment which was a willful violation of the ADA and PHRA.

Based upon the above, the plaintiff alleges that she has suffered

economic injury, as well as embarrassment, humiliation, emotional distress and mental anguish. The plaintiff is seeking damages as well as reinstatement to her former position.

In an attempt to controvert the allegations set forth in the plaintiff's complaint, the defendant has provided a statement of material facts, the following of which are not in dispute and supported by the record.

The plaintiff began her employment with Verizon on April 5, 1993, as a Residential Collections Consultant in Verizon's Wilkes-Barre office[2]. In this position, the plaintiff's duties included taking calls from customers, negotiating customer payment arrangements and restoring service to customers whose service had been discontinued for failure to pay outstanding bills.

When Verizon closed the Wilkes-Barre office in September 2003, the plaintiff transferred to the Scranton office where she began working as a Customer Sales and Service Consultant. In this position, the plaintiff's job duties changed from billing duties to sales duties and included taking calls from customers and selling Verizon's telephone, Internet and television services to new and existing customers. The plaintiff testified that, as a sales consultant, she was not responsible for the billing functions, but felt that, as a company representative, it was her job to take care of customers. (Doc. No. 48, Ex. A, pp. 36-37). In this position, the plaintiff was paid a base salary. In addition, if the plaintiff met certain objectives, she could make a commission.

---

[2]Unless disputed, supporting record references have been omitted.

Sales consultants were evaluated and received incentives based upon the number of products sold. The more a consultant sold, the more the consultant could make in commissions. (Id. at pp. 22, 40-41). In addition, if a consultant sold a certain number of products in one day, they could qualify to participate in a drawing for prizes. (Id.). The plaintiff testified that she felt pressure to meet the goals for increased sales incentives which changed from year to year. (Id. at p. 40).

In her position as a Sales Consultant, the plaintiff received extensive training, including annual training on Verizon's Code of Conduct. Plaintiff acknowledged that Verizon takes its Code of Conduct seriously. The defendant's materials provide that the Code of Conduct provides, in part:

Sustain a Culture of Integrity

This Code of Conduct is a statement of our principles and expectations that guide ethical business conduct at Verizon. Verizon requires all employees to use their judgment, to be accountable for their actions, and to conduct business with integrity.

(Doc. No. 48, Tab C, Ex. 3)[3]. During her deposition testimony, the plaintiff admitted that honesty at work is important[4]. In addition, the plaintiff signed a

---

[3]Although the plaintiff denies this statement, the document speaks for itself.

[4]Plaintiff's counsel challenges the defendant's reliance upon the plaintiff's deposition testimony in support of this statement claiming that the answers given by the plaintiff are not admissible evidence at this stage of the proceedings because counsel objected to the form of the questions presented

(continued...)

document entitled "Consumer Sales Requirements Regarding Service Standards for the Handling of Customer Calls," which states that Sales Consultants must, *inter alia*: "Maintain sales integrity on every call and follow your local sales guidelines" and "Deny or restore only those accounts that require the action based on current guidelines." (Doc. No. 48, Tab C, Ex. 5).

"Final bills" are indicators placed on a customer's account when there is an outstanding amount owed on their bill. Where the system correctly noted that someone had a final outstanding bill, the sales consultant could not offer them additional services; however, the system was not always correctly noted with a final bill. (Doc. No. 48, Ex. A, pp. 30-31). The plaintiff testified that in her four years as a sales consultant, the policy never changed that you could not offer additional products to people who had final bills. (Id. at pp. 29-30). The plaintiff testified that she thought that she could do billing work while she was a sales consultant because she had the knowledge to do so; however, she also testified that Verizon told her that, as a sales consultant, if she had billing questions, she should transfer them to the billing department, and that

---

[4](...continued)
at the deposition. Counsel's objection does not go to the substance of the plaintiff's testimony, but only to the form of the question posed by the defendant's counsel; therefore, the testimony can be considered on a motion for summary judgment. See Griffith v. Selsky, 325 F.Supp.2d 247, 249 n.1 (W.D.N.Y. 2004) (court deciding a motion for summary judgment can consider evidence that would not be admissible at trial, if it appears that admissible evidence will be available) (citing Burlington Coat Factory Warehouse Corp. v. Esprit De Corp., 769 F.2d 919, 924 (2d Cir. 1985).

no one at Verizon ever told her that if there was a billing issue she could do it herself. (Id. at pp. 39-40). No one from Verizon told the plaintiff that she could or should handle billing issues while working as a Sales Consultant. The plaintiff was not trained on billing and/or collections while employed as a Sales Consultant nor did she receive updates regarding legal changes in the billing department.

In October 2007, the plaintiff was supervised by Gina Silance. The plaintiff had no problems working with Ms. Silance. On October 22, 2007, Ms. Silance observed the plaintiff during a call with a customer. On that occasion, the plaintiff "flupped to a pin" on Verizon's computer system, which removed restrictions from the customer's account. (Doc. No. 48, Ex. B, pp. 41-42). Ms. Silance testified that she spoke to the supervisor in the Collection Department who, in turn, checked with another supervisor in the Collection Department and reported that the pin was an automated pin that collection representatives used to remove restrictions from customers' accounts after their bill had been paid. (Id. at pp. 41-44). According to Ms. Silance, "we never restore toll services in the sales and service center regardless of whether the customer had paid a bill or not. We would have transferred that call to the collection center, they would in turn determine whether or not the bill was satisfied. And then they would transfer the customer back to us for whatever services they were entitled to."

The plaintiff's conduct in "flupp[ing] to a pin" violated Verizon's Code of

Conduct because she manipulated Verizon's computer system and sold services to a customer who was not entitled to them because the customer had a final bill[5]. (Doc. No. 48, Ex. B, pp, 76, 80).

As to the observed call, the plaintiff testified:

Q:    This customer had a final bill?
A:    Yes.
Q:    And then if you go up to the next line above that it says KF1 and it indicates PASS CTA R1.
A:    CTA was an automated system that would restore services.
Q:    And again, is a sales consultant supposed to be the person taking the indicator off and restoring service or is that to be done by the collections department?
A:    That would have been something done by the collections

---

[5]The plaintiff denies this statement citing to an Unemployment Compensation Referee's Decision/Order finding that the plaintiff had not engaged in willful misconduct for purposes of receiving unemployment compensation benefits. Relying on Jones v. UPS, 214 F.3d 402 (3d Cir. 2000), the plaintiff argues that the defendant is not now in a position to re-litigate the issue as to whether she was terminated due to Code of Conduct violations.

Initially, although the Referee concluded that the plaintiff had not engaged in willful misconduct, the Referee found, that the plaintiff had, in fact, violated Verizon's Code of Conduct on a number of occasions, which weighs against the plaintiff's argument.

Moreover, in Jones, the court's analysis was premised on its application of 28 U.S.C. §1738, State and Territorial statutes and judicial proceedings; full faith and credit, which is inapplicable in the instant action as the decision of the Unemployment Compensation Referee was not the subject of any ruling or judgment in the state court. See Wolski v. City of Erie, — F.Supp.2d —, 2011 WL 773483, *8 (W.D.Pa., Feb. 25, 2011). Further, the Supreme Court has held that unreviewed state administrative proceedings may not be given preclusive effect in Title VII or ADEA cases. Id. (citing Univ. of Tenn. v. Elliott, 478 U.S. 788, 796 (1986) (Title VII); Astoria Federal Savings & Loan v. Solimino, 501 U.S. 104, 110-14 (1991); holdings which have been extended by federal courts to ADA cases. Id. (citations omitted).

department.

Q:     Okay. And this is indicating that you did it in this case?

A:     Correct.

Q:     Why did you do that?

A:     I don't know for sure exactly what was happening in this particular case. I don't remember to be honest with you.

The plaintiff later admitted that she did not transfer the customer to collections because she would have lost the sale. As a result of the plaintiff's actions, she received credit for the sale. (Doc. No. 48, Ex. A, p. 175).

While investigating the observed call, Ms. Silance discovered three other incidents of similar conduct by the plaintiff. (Id., Ex. B, p. 62).

Ms. Silance testified based upon records from September 14, 2007, that the plaintiff "flupped to [the] pin" to remove restrictions on a customer's account when the customer had restrictions on toll and nonbasic services and provided services that should have been refused based upon the restrictions[6]. (Doc. No. 48, Ex. B, pp. 103-04, 106).

On September 17, 2007, the plaintiff again removed restrictions from a customer's account when the customer had final bills resulting in the customer receiving services to which he/she was not entitled and the plaintiff receiving credit for a sale to which she was not entitled[7]. As to this call, the

---

[6]Relying, in part, upon page 105 of Ms. Silance's deposition, the plaintiff denies this statement arguing that the call was transferred to the collections department. However, the deposition testimony referred to by the plaintiff has not been placed in the record before the court.

[7]The plaintiff neither admits nor denies this statement, but points out
(continued...)

plaintiff admitted to placing an indicator on the customer's account and then removing the indicator, a function which should have been performed by the collections department, not the plaintiff. The plaintiff indicated that she did this because she felt the customer's records were wrong. (Doc. No. 48, Ex. A, p. 157).

On October 12, 2007, the plaintiff removed restrictions from a customer's account when the customer had final bills. (Doc. No. 48, Ex. B, 91-92, 94, 96). The plaintiff admitted to transferring a credit to pay the customer's final bill. (Id., Ex. A, pp. 142, 148). Although the plaintiff conceded that she should not have taken these actions as a sales consultant, (Doc. No. 48, Ex. A, p. 147), the plaintiff's counsel argues that Ms. Silance testified that, in this instance, there was a Verizon error through which Verizon placed credits to the wrong account for a customer, (Doc. No. 52, ¶35). However, the testimony of Ms. Silance indicates that the plaintiff essentially performed a role that should have been done by collections. (Id., Ex. B, pp. 91-92, 94, 96).

On October 25, 2007, Ms. Silance and Karen Alunni, another supervisor, met with the plaintiff and her union representative, Sandee Hartshorn. During this meeting the plaintiff admitted to doing activities that should have been performed by the billing department, namely removing

---

[7](...continued)
that Ms. Silance testified that the plaintiff noted in the records from the call of September 17, 2007, that DSL should be added once the block on the account was lifted. (Doc. No. 48, Ex. B, p. 101).

permanent restrictions from customer accounts, (Doc. No. 48, Ex. A, p. 187).

The plaintiff was discharged from her employment that same day.

Diane Sosnowski, Manager of the Scranton office, made the decision to discharge the plaintiff with guidance from Cindy Marinari in Verizon's Labor Relations Department. The plaintiff stated that she should not have been discharged because she worked 14 ½ years with Verizon and had no prior discipline. Although the Union initially filed a grievance over the plaintiff's discharge, it subsequently withdrew the grievance and elected not to proceed to arbitration.

The plaintiff was diagnosed with lupus and fibromyalgia on September 25, 2007[8]. Following her diagnosis, the plaintiff had no work restrictions and needed no accommodations to perform her job.

As a result of her conditions, the plaintiff testified that she experienced pain, occasional blurred vision, weakness and fatigue, and an inability to talk for a period of about three weeks because of a mass on her neck. As to her blurred vision, the plaintiff testified that it was occasional, and that she continued to drive and did not relinquish her driver's license because she "didn't really have any reason to." As to her inability to talk, the plaintiff

---

[8]The plaintiff admits this fact, but adds that her doctors had given her a differential diagnosis of Sjogren's Syndrome, Sarcoid, Lupus, and overlap CTD. (Doc. No. 42, ¶43). However, the plaintiff has not, either in her complaint or in her deposition, based her disability discrimination claim upon these impairments.

testified that this condition lasted for at least three weeks in April 2007 because of the mass on her neck, but that it would "come and go." After having a tonsil removed on July 25, 2007, the plaintiff had no further problems speaking. As to weakness and fatigue, the plaintiff testified that she had an overall inability to walk and difficulty getting up and down after sitting for long periods, but did not use a walker or wheelchair during this time. The plaintiff also testified that she did not need a cane or a walker to walk and was able to climb the stairs in her home[9]. Although the plaintiff testified that she cannot go as long as she used to, she testified that she is able to go shopping and take her dogs for a walk. (Doc. No. 48, Ex. A, pp. 74, 76). As of the plaintiff's deposition, she testified that she is able to care for herself, clean her home, perform yard work and drive. (Id. at p. 74). The plaintiff continued to attend Penn State football games and climbed the stadium stairs at those events.

The plaintiff's physicians addressed her various symptoms with medication which began to work in 2008 after her discharge from Verizon. The plaintiff testified that, with respect to her overall condition, "[e]verything is now controlled with medication."

Between March 2007 and July 2007, the plaintiff was granted FMLA

---

[9]The plaintiff admits to the facts set forth in this paragraph, but adds that she had ongoing medical problems and was receiving regular treatment from a number of doctors at the time of her discharge, including her Rheumatologist, Dr. David Pugliese. (Doc. No. 52, ¶¶46-51; Doc. No. 55, Ex. A).

leave and/or Short Term Disability leave on three occasions. The plaintiff's final leave of absence ended on August 8, 2007. Verizon approved all Short Term Disability and FMLA leave time requested by the plaintiff. The plaintiff admitted that no one at Verizon ever made negative comments about her alleged disability. On the intake questionnaire that the plaintiff filed with the EEOC, the plaintiff admitted that no one at Verizon regarded or perceived her as disabled. The plaintiff agreed that Ms. Silance and Ms. Sosnowski were supportive of her when she was on FMLA leave. Following each leave of absence, the plaintiff was returned to the same job with the same pay and the same benefits.

In light of the above facts, the defendant argues that the plaintiff cannot establish a *prima facie* case of disability discrimination. (Doc. No. 46, pp. 6-14).

The ADA provides, in part, that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."[10] 42 U.S.C. §12112(a). In reviewing a motion for summary judgment to determine if there is a genuine

---

[10]A "covered entity" is "an employer, employment agency, labor organization, or joint labor-management committee." 42 U.S.C. §12111(2). The parties do not dispute that the defendant is a "covered entity."

issue of material fact concerning whether an employer illegally discriminated against an employee, the court applies the test articulated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and refined in Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981). Raytheon, 540 U.S. at 49 n.3; Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000) (citing Walton v. Mental Health Ass'n. of Southeastern Pennsylvania, 168 F.3d 661, 667-68 (3d Cir. 1999)). The McDonnell Douglas test "establishe[s] an allocation of the burden of production and an order for the presentation of proof in . . . discriminatory-treatment cases."[11] Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993)) (internal omission in original). To succeed on an ADA disparate-treatment claim under the McDonnell Douglas test, the plaintiff must establish by a preponderance of the evidence a *prima facie* case of discrimination. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993). A *prima facie* case requires the plaintiff to establish three (3) elements:

1.  She is a disabled person within the meaning of the ADA;
2.  She is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and,
3.  She has suffered an otherwise adverse employment decision as a result of discrimination.

Gaul v. Lucent Technologies, Inc., 134 F.3d 576, 580 (3d Cir. 1998) (citing Shiring v. Runyon, 90 F.3d 827, 831 (3d Cir. 1996)).

---

[11]The burden of persuasion always remains upon the plaintiff. Reeves, 530 U.S. at 143 (citing *Burdine*, 450 U.S. at 254).

If the plaintiff makes her *prima facie* showing, there is a presumption of discrimination. St. Mary's Honor Ctr., 509 U.S. at 506 (citing Burdine, 450 U.S. at 254). The burden then shifts to the defendant to rebut the presumption by "produc[ing] evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." Reeves, 530 U.S. at 142 (citing *Burdine*, 450 U.S. at 254). The defendant's burden is "relatively light." Tomasso v. Boeing Co., 445 F.3d 702, 706 (2006) (citing Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994)). If the defendant produces evidence of a nondiscriminatory reason for the challenged conduct, the presumption "drops from the case." St. Mary's Honor Ctr., 509 U.S. at 507 (quoting Burdine, 450 U.S. at 255). "Once the employer answers its relatively light burden by articulating a legitimate reason for the unfavorable employment decision, the burden of production rebounds to the plaintiff, who must show by a preponderance of the evidence that the employer's explanation is pretextual. Fuentes, 32 F.3d at 763.

The ADA defines "disability" with regard to an individual as either: (i) "a physical or mental impairment that substantially limits one or more of the major life activities of such [an] individual"; (ii) "a record of such an impairment"; or (iii) "being regarded as having such an impairment." 42 U.S.C. §12102(2).

In this case, the plaintiff concedes that she does not have a record of a disability and that Verizon did not regard her as disabled; therefore, the

court focuses on the first definition of disability. To establish a disability under the first definition, the plaintiff must show that she has a physical or mental impairment that "limits a major life activity." Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184 (2002). Merely establishing that the plaintiff suffers from an impairment is insufficient. Id. Instead, a plaintiff must "demonstrate that the impairment limits a major life activity." Id. The phrase "major life activities" refers only "to those activities that are of central importance to daily life." Id. at 691. "Major life activities" may include such activities as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working. 29 C.F.R. §1630.2(h)(1)(2006). A plaintiff "must further show that the limitation on the major life activity is 'substantia[l].'" Toyota Motor Mfg., 122 S.Ct. at 690 (quoting 42 U.S.C. §12102(2)(A)). To be substantially limited in a major life activity:

> an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long-term.

Id. (citing 29 C.F.R. §1630.2(j)(2)(ii)-(iii)).

In this case, the plaintiff testified that she was discriminated against based upon her autoimmune diseases of lupus and fibromyalgia. (Doc. No. 59). As a result of these conditions, the plaintiff testified that she suffered intermittent blurred vision, difficulty walking and an inability to talk. Seeing, walking and speaking are major life activities. However, the plaintiff has not

18

produced any evidence that the effects of these conditions were long-term or permanent. Specifically, the plaintiff testified that her blurred vision was not constant and that, even with this condition, she continued to drive. The plaintiff testified that her blurred vision was resolved with medication in 2008. Concerning her ability to walk, the plaintiff testified that, even with her difficulties with walking, she never used a wheelchair, a walker or a cane. She testified that she continued to be able to do things such as shopping, walking her dog and going to football games, although her stamina was not what it used to be. Finally, with respect to her inability to talk, the record reflects that this occurred during a three-week period and was only intermittent during that time. Once her tonsil was removed in July 2007, this condition resolved.

In an attempt to establish that the above impairments were disabling, the plaintiff provides medical records which indicate that she had been receiving regular and continuing medical care from various physicians for a number of issues. However, upon review, a vast majority of the records relate to the time period after the plaintiff's termination and are irrelevant for purposes of considering the plaintiff's disability claim. See Taylor v. Phoenixville School Dist., 184 F.3d 296, 308 (3d Cir. 1999) (plaintiff must demonstrate that she is substantially limited in a major life activity during the period of time the alleged discrimination occurred). Moreover, of those records that relate to the relevant period, the medical records to not document any limitations based upon the plaintiff's conditions which would be

considered "substantial" under the definition set forth above.

In light of the above, the plaintiff has not established that she is a qualified individual with a disability which would entitled her to relief under either the ADA or PHRA[12]. Therefore, the defendant's motion for summary judgment will be granted.

On the basis of the foregoing, **IT IS HEREBY ORDERED THAT:**

**(1)**   the defendant's motion for summary judgment, **(Doc. No. 45)**, is **GRANTED**; and

**(2)**   the final pretrial conference scheduled for April 29, 2011, and the trial scheduled for May 31, 2011 are cancelled.

**(3)**   the Clerk of Court is directed to enter judgment in favor of the defendant and against the plaintiff, as well as close the case.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States Magistrate Judge**

**Date:** April 4, 2011

O:\shared\MEMORANDA\2009 MEMORANDA\09-1553-01.wpd

---

[12]As the court finds that the plaintiff has failed to establish that she was disabled within the meaning of the ADA, the remaining issues raised by the defendant, including whether the plaintiff can satisfy the third prong of the *prima facie* analysis by showing that she was discharged because of a disability and whether the plaintiff can demonstrate pretext, need not be addressed herein.